# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**PAUL J. WALLO,**

        **Plaintiff,**

**v.**                                  **Civil Action No. 1:04-CV-99**
                                                     **(Keeley)**

**JO ANNE B. BARNHART,**
**COMMISSIONER OF**
**SOCIAL SECURITY,**

        **Defendant.**


## OPINION/ REPORT AND RECOMMENDATION

This is an action for judicial review of the final decision of the defendant Commissioner of the Social Security Administration ("Defendant") denying the plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on Plaintiff's Motion for Judgment on the Pleadings and Defendant's Motion for Summary Judgment, and has been referred to the undersigned United States Magistrate Judge for submission of a Report and Recommendation. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. PROCEDURAL HISTORY

Plaintiff Paul J. Wallo ("Plaintiff") originally filed his application for DIB on February 6, 1995, alleging disability since February 2, 1995, due to dizzy spells, high blood pressure, and headaches (R. 77). The claim was denied at the initial and reconsideration levels of review (R. 96-97). Plaintiff requested a hearing, which Administrative Law Judge ("ALJ") J. Joseph Herring held on January 16, 1998 (R. 11). Plaintiff, who was represented by a non-attorney benefits representative, appeared and testified on his own behalf, along with Vocational Expert Francis

Kinley ("VE"). On July 23, 1998, the ALJ issued a decision finding Plaintiff had not been under a disability, as defined in the Social Security Act, at any time through the date of decision (R. 17). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R.3).

Plaintiff appealed to the United States Court for the Northern District of West Virginia. On June 14, 2001, United States Magistrate Judge James E. Seibert issued a Report and Recommendation finding the ALJ erred by not making the threshold determination of whether Plaintiff had demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged, before going on to the second step of his credibility analysis. *See Craig v. Chater*, 76 F.3d 585 (4th Cir. 1996). He recommended Plaintiff's Motion for Summary Judgment be granted and Plaintiff be awarded benefits (R. 289-303).

On September 14, 2001, United States District Judge Irene M. Keeley issued an order accepting-in-part and rejecting-in-part the Magistrate Judge's Report and Recommendation (R. 283-288). Judge Keeley found that the Magistrate Judge correctly asserted that *Craig* required the ALJ to apply the two-step credibility analysis, and to first determine whether the claimant has demonstrated, by objective medical evidence, an impairment capable of causing the degree and type of pain alleged (R. 285). Judge Keeley also found that the Magistrate Judge correctly found the ALJ failed to expressly make the first-step, threshold determination. Judge Keeley also found, however, "[i]t is clear that the ALJ carefully reviewed the medical records and objective test results." She therefore denied both Plaintiff's and Defendant's Motions for Summary Judgment and remanded the case to the Commissioner "for a determination whether the claimant did or did not have an impairment evidenced by objective medical evidence capable of producing the alleged pain or other

symptoms" (R. 288).

On December 3, 2001, the Appeals Council vacated the final decision of the Commissioner and remanded the claim to the ALJ for further proceedings (R. 324-325).  In the meantime, Plaintiff had filed another application for DIB on December 18, 2000, and was subsequently found disabled beginning September 8, 2000, exactly six months before his 55th birthday, when, by Regulation, he would become an individual of "advanced age," but not before that date (R. 324).[1]  The Appeals Council therefore directed the ALJ to address the issue of onset of disability prior to December 2000.  The relevant time period of this claim is therefore February 2, 1995, until September 8, 2000.

Upon remand, ALJ Steven Slahta held a hearing on August 14, 2002 (R. 594).  Plaintiff, represented by counsel, appeared and testified, along with VE Larry Ostrowski.  On November 18, 2002, the ALJ issued a decision finding Plaintiff was disabled as of September 8, 2000, exactly six months before his 55th birthday (when he would become an individual of "advanced age" pursuant to 20 CFR § 404.1563), but not before (R. 274).

## II. FACTS

Paul J. Wallo ("Plaintiff") was born on March 8, 1946, and was 56  years old at the time of the second Administrative Hearing (R. 36).  He was 48 when he filed the application at issue, however, and 54 when he was awarded benefits on his subsequent application.  He has a high school degree and an Associates Degree in business administration, and has past relevant work in various positions in the coal mining industry  (R. 82, 601).

---

[1]The undersigned notes the first ALJ in 1998 limited Plaintiff to work at the "light" exertional level (R. 16).  At age 52, Plaintiff at that time would have been an individual closely approaching advanced age.  20 CFR § 404.1563.  Under Rule 202.14, Table No. 2, Appendix 2, Subpart P, Regulations No. 4, he would have been "not disabled."  However, even with precisely the same limitations, Plaintiff would become "disabled" when he turned 55, pursuant to 202.04.

The relevant time frame for this claim is February 2, 1995 through September 7, 2000.

Plaintiff injured his back at work in 1977, when he tried to catch a heavy object that was falling. He was given medication (R. 236). X-rays in 1978 showed only mild degenerative changes primarily involving L3 and L4 and no significant change since November 1977. A myelogram showed minimal indentation in the column, mainly ventrally, L4-L5, but "otherwise normal." Plaintiff saw Dr. Wiley and was placed in a chairback brace for three to six months with only temporary improvement of his symptoms. He also received epidural injections with only temporary improvement in symptoms. Plaintiff was off work from November 23, 1977 through April 10, 1978, July 26, 1978 through February 1979, and again from May 15, 1980 through July 6, 1980 due to this injury. Plaintiff told the workers's compensation examiner he could no longer dance or bowl, and had difficulty hunting because of this injury.

Plaintiff suffered an additional injury to his lower back at work in October 1981, when a rock fell and struck him on his right side causing injury to his neck and lower back (R. 237). X-rays showed no fracture. He received physical therapy and was off work for approximately one month. He never had injections in his neck.

Plaintiff suffered a third work injury in December 1982, when a belt broke and dumped coal and rocks onto his right leg (R. 238). X-rays of the leg revealed edema, but were otherwise unremarkable. He was treated with medication and rest and was off work from December 3, 1982 until February 1983. Plaintiff reported no residual problems from this injury.

Plaintiff suffered a fourth work injury on August 12, 1983, when a 10-ton shield fell on his right foot (R. 239). X-rays revealed a compound fracture of the right big toe. The wound was cleaned and bandaged for one month. He received no additional treatment for that injury.

In April 1984, Plaintiff fell at home injuring his right knee (R. 394). He underwent arthroscopy of the right knee.

Plaintiff suffered a fifth work injury in September 1984, when he stepped in a hole, injuring his right knee (R. 239). He had arthroscopic surgery of the knee and was off work from September 1984 until April 1985 (R. 337). He received a three percent impairment for this injury at the time (R. 337).

Plaintiff suffered a sixth work injury in August 1990, when he injured his left elbow while lifting a heavy object (R. 239). He did not have surgery, but was off work from September 28, 1990 through April 29, 1991 (R. 341). He later stated he received either a one or three percent impairment rating for this injury at the time.

In August 1990, Plaintiff was examined by a neurologist for headaches he had been having for four to five years (R. 446). CT scans were normal. He had hypertension, but otherwise no medical problems. Physical examination was basically normal, gait and coordination were normal, and sensory exam was normal. The neurologists' impression was that Plaintiff had vascular headaches which could come as migraine plus tension headache. He was started on medication for migraine and tension headache.

On September 30, 1992, Plaintiff complained of dizziness, and was diagnosed with an ear infection (R. 457).

On April 21, 1993, Plaintiff complained of persistent headaches, sinus congestion, and pain (R. 461). He was diagnosed with sinusitis.

On May 24, 1993, Plaintiff complained of chest pain with some numbness in the left arm and hand (R. 461). All tests were normal, and Plaintiff's physicians diagnosed musculoskeletal pain.

Plaintiff continued to complain of chest pain intermittently through 1993 (R. 465). All tests continued to be normal, and he continued to be diagnosed with musculoskeletal or pleuritic pain. Plaintiff was convinced, however, that he had coronary artery disease and was insisting on a heart catheterization.

An MRI of the cervical spine in February 1994 showed minor disc protrusions at C3-4 and C4-5, and disc protrusion at C5-6 on the right with slight encroachment of the dural sac (R. 530).

Plaintiff continued to be concerned about coronary artery disease through February 1994 (R. 466). His physical examination continued to be unremarkable, and all test results were normal. His treating physician referred him to a cardiologist.

Plaintiff was examined by a cardiologist on February 2, 1994 (R. 466). The doctor first noted Plaintiff's reported chest pain was very atypical for angina. All tests continued to be normal, and Plaintiff had minimal risk factors for coronary artery disease. Although the cardiologist assured Plaintiff that his risk of coronary artery disease was very minimal, Plaintiff insisted on cardiac catheterization because that was the "gold standard." The cardiologist stated he would consider performing the procedure if Plaintiff's insurer approved it.

On July 15, 1994, Plaintiff continued to complain of chest pain with weakness in the upper extremities, some neck pain and paresthesias of both hands (R. 468). He stated he was unable to work because of these problems. Examination was normal except for some tenderness in the chest wall and some tenderness in the cervical muscle area. Grip strength was normal. Plaintiff told his doctor he got shortness of breath with exertion and was unable to be in humidity changes, unable to work on heights, and unable to do any lifting over 10-20 pounds. Plaintiff's doctor diagnosed him with COPD.

On September 27, 1994, Plaintiff's doctor referred him to a pulmonologist for his complaints

6

of shortness of breath for six months. The doctor noted that Plaintiff had been off work for the last 15 months due to chest pain (R. 469). All testing remained normal. Plaintiff told the doctor he could walk on level ground, but any upgrade caused problems with shortness of breath. He could only walk 10 to 15 steps. He also had a cough. The pulmonologist noted Plaintiff also reported "Occasional headaches and occasional problems with swallowing and palpitations." Examination was essentially normal except for an umbilical hernia. Lungs were clear. The pulmonologist diagnosed dyspnea, and wondered if it could be due to primary pulmonary disease worse with weight gain. He ordered pulmonary function tests.

On October 25, 1994, Plaintiff returned to the pulmonologist for the results of his pulmonary function tests (R. 470). He still reported some dyspnea on exertion. The doctor reported all tests were normal, and there was no evidence of cardiopulmonary impairment. He advised Plaintiff to lose about 20 pounds and keep up with physical activity and a regular exercise program.

From October 31, 1994 through December 28, 1994, Plaintiff visited his treating physician five times, complaining of sinus congestion, cough and congestion, and sinusitis (R. 470). He was diagnosed with an upper respiratory tract infection on all five occasions.

In Plaintiff's application of February 6, 1996, he alleged disability due to dizziness (R. 77). He stated in his Disability Report that this condition started bothering him on February 1, 1995, and he quit work on February 2, 1995. Plaintiff explained how his condition kept him from working as follows:

> I get dizzy to the point of almost passing out. Blood pressure has been high a lot of the time. When I try to stand up I can't without taking a chance of falling.

Plaintiff also stated he first saw Dr. Manchin regarding this impairment on February 3, 1995, and last saw him on January 22, 1996 (R. 78). Neither party cites to any actual records from this period,

however, and, after reviewing the entire administrative record, the undersigned could find none.[2] Plaintiff's stated reason for his treatment with Dr. Manchin during this time was hypertension and dizziness. As to limitations or restrictions his doctor placed on him, Plaintiff stated only: "He just said to do what I could" (R. 81). As daily activities, Plaintiff stated he did very little housework, for about 15 or 20 minutes; washed dishes a couple times a week; did some shopping with his wife; listened to music; watched television; and visited with friends once a week for an hour or two (R. 81). He stated he no longer cut his grass because he was "afraid of what might happen," and had not driven for about a month.

The undersigned could not locate any records of treatment from December 28, 1994, through Plaintiff's alleged onset date of February 2, 1995, and neither party cites to any records from that time period.

On January 22, 1996,[3] Dr. Manchin wrote a "To Whom it May Concern" letter, stating Plaintiff had been off work since February 2, 1995, due to chronic dizziness and fatigue (R. 108). He stated it was his professional medical opinion that Plaintiff was not able to participate in gainful employment at that time due to the chronic dizziness and fatigue. He noted he was still in the process of having Plaintiff worked up for this problem.

On January 29, 1996, Plaintiff was examined by neurologist Shiv Navada, M.D. for his

---

[2]As noted below, there is one letter from Dr. Manchin dated January 22, 1995, but the year on this date is undoubtedly incorrect.

[3]The date on this letter is January 22, 1995, but this is not possibly correct, since Dr. Manchin states Plaintiff was unable to work since February 2, 1995. A review of the remainder of the record indicates this letter must have been written on January 22, 1996. The undersigned notes Plaintiff stated he last saw Dr. Manchin on January 22, 1996, before filing his February 6, 1996 application.

complaints of dizziness (R. 94). Plaintiff had already been off work for nearly a year because of this condition. Plaintiff described the sensation as "feeling flushed." He got a warm feeling and felt shaky inside, and felt as if things were getting dark. He said that earlier on, these spells were accompanied by true vertigo. These spells lasted for one to five minutes and might occur once or twice a day. Sometimes he felt like going to sleep afterward. Upon examination, Plaintiff was alert and oriented. He seemed "somewhat frustrated." Strength and sensation were normal. He was able to walk on toes and heels. He could tandem walk and squat. His spine was nontender. Straight leg raises were negative. Cervical and lumbar range of motion was full. Plaintiff had "a few beats of nystagmus on right lateral gaze," which the neurologist opined might be due to "a mild degree of mild vestibulopathy, although . . . an ENT surgeon evaluate[d] him and . . . no obvious abnormalities were found by him." Dr. Navada nevertheless diagnosed dizziness probably secondary to vestibulopathy and instructed Plaintiff regarding some vestibular exercises. He noted that because the problem was disabling Plaintiff to the point that he was not even driving, he would recommend input from a tertiary care center, such as the Cleveland Clinic.

Plaintiff was evaluated at The Cleveland Clinic by neurologist Anthony Furlan, M.D. on April 1, 1996 (R. 98). Plaintiff complained of "intermittent 'dizziness'" for one year, which he described as "heating up and going dark." Plaintiff stated that his blood pressure medications were decreased three months earlier and the spells decreased from daily to two per week. Dr. Furlan opined that, except for some numbness in his right toes related to old trauma, Plaintiff's neurologic examination was "completely normal." He diagnosed "nonspecific dizziness" and opined the episodes sounded vasovagal in nature. He was suspicious that stress was "a major factor." He gave Plaintiff a self-administered personality test to complete. He advised minimizing his blood pressure

9

medications and considering tilt table studies.

On April 26, 1996, psychologist Gary DeNelsky, Ph.D. of the Cleveland Clinic opined:

> Results of his MMPI-2 [personality test] point strongly in the direction of very high potential for development of functional symptoms. He is markedly somatically preoccupied, generally rather repressive of psychological issues, and appears to be rather comfortable with little indication of significant emotional upset. His overall testing is both consistent with and suggestive of high potential for development of symptoms on a conversion reaction basis.

On May 16, 1996, Plaintiff stated in his Request for Reconsideration that he could do things for himself as long as he was not dizzy, but that it was hard to tell when he would become dizzy (R. 88). He also stated his doctor told him was "not able to do any employment which includes sitting or any type of sedentary work" (R. 86). He stated his wife "does the driving now because I can't most of the time," and that he basically did not do much of anything except read and ride with his wife (R. 88).

On May 21, 1996, Dr. Furlan wrote to Dr. Manchin stating that Plaintiff's personality testing results suggested a strong possibility for functional symptoms (R. 180). He continued that, if the dizzy spells continued and no cause was found, he would suggest psychological stress counseling.

On July 18, 1996, psychiatrist Dr. Surekha Kurapati, M.D. evaluated Plaintiff for his complaints of "dizzy spells" (R. 437-438). He stated that even after Dr. Manchin stabilized him, he continued to have the dizzy spells "on and off, with no specific pattern." They occurred sometimes while sitting, sometimes while having a conversation with friends, and sometimes during a walk. He also mentioned decreased memory, decreased concentration and decreased energy. His mood and affect were euthymic, he denied any panic attacks, but admitted to some checking/rechecking things, especially in the area of "keeping things tidy." He had never had any psychiatric treatment or history. He told the psychiatrist he finished high school, then joined the armed services and went

to Vietnam. After discharge he attended two years of college. He got along well with all his children and raised them. One of his adopted sons had cerebral palsy and he kept in close touch with him. He described himself as "an easy-going person."

Upon mental status exam, Plaintiff was alert and fully oriented (R. 438). Behavior was appropriate, interaction was pleasant and friendly, speech was clear, coherent and productive, mood and affect were euthymic with broad range, and thought processes were intact. He denied any hallucinations, suicidal ideations or homicidal ideations. The doctor noted Plaintiff's memory was intact even though he complained of a loss of memory. He was only slightly impaired on his recall after five minutes. His concentration was good. He could do serial 3's and 7's. The doctor found Plaintiff answered judgment questions appropriately, but opined his "history and actions" showed some impaired judgment. Dr. Kurapati noted that, although Plaintiff's only complaints were dizziness and vertigo, he talked about chest pain, back problems, headaches, and teeth grinding. She felt an underlying anxiety was expressed in many ways and felt there was a strong psychological component contributing to his anxiety. She continued him on his Serzone, but increased the dosage, and encouraged him to do some physical exercise.

Dr. Kurapati assessed Plaintiff at this time with "rule out" undifferentiated somatoform disorder and anxiety disorder not otherwise specified. She assessed his GAF as 61 to 70[4] currently,

---

[4]A GAF of 61 to 70 indicates **Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.** Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

and 71-80[5] one year ago.

Dr. Kurapati saw Plaintiff about once a month from July 1996 until December 19, 1996 (R. 434 - 436). He continued to complain of dizzy spells at those five visits, but they were "not like vertigo." His mood and affect continued to be euthymic. He denied any anxiety other than when he got a tingling sensation in his left hand and the dizzy spells. His sleep was good. He was not depressed. His only compliant was dizziness, and anxiety associated with the dizziness. Dr. Kurapati wanted to refer Plaintiff to a neurologist to rule out any neurological components, before treating him as "Atypical mood [disorder]." She no longer diagnosed a somatoform disorder, but did diagnose anxiety disorder, not otherwise specified.

Dr. Kurapati felt Plaintiff was minimizing his anxiety. She also felt it "very likely his spells could be aborted with him breathing into paper bag." She encouraged him to try that during a spell. He did appear more relaxed since starting on Depakote. His mood and affect remained euthymic.

On September 27, 1996, Plaintiff wrote regarding his daily activities and social functioning in his Request for Hearing that he did not do anything other than go to the mall and out to eat once in a while (R. 92). He also noted he was being seeing by Dr. Kurapati for depression.

On November 14, 1996, Dr. Kurapati opined the Serzone was not helping Plaintiff much and changed his medication to Paxil.

On December 19, 1996, Dr. Kurapati noted Plaintiff stopped the Paxil and tried Buspar, but felt it was causing more dizzy spells (R. 434). He was still not exhibiting any symptoms of depression. He described himself as anxious and tense at times, but the doctor noted he did not

---

[5]A GAF of 71 to 80 indicates that: **If symptoms are present, they are transient and expectable reactions to psychosocial stressors** (e.g., difficulty concentrating after family argument); **no more than slight impairment in social, occupational, or school functioning** (e.g., temporarily falling behind in schoolwork). Id.

present with any symptoms of this during interviews. She continued to diagnosed anxiety disorder, not otherwise specified and "rule out" panic attacks.

A January 1997 electroencephalogram was normal awake and asleep (R. 157).

On February 7, 1997, neuropsychologist John Young, M.D. stated he had seen Plaintiff on several occasions (R. 178). Neurological examination showed no abnormalities except for a lack of stretch reflexes. Plaintiff had no focal motor weakness or other sensory deficit to suggest a peripheral neuropathy. Thyroid tests were normal; MRI of the brain was normal; EEG was normal. Dr. Young was unable to diagnose any objective neurological abnormality.

On February 12, 1997, Plaintiff presented to Dr. Manchin for complaints of bronchitis and dizziness (R. 168).

On June 7, 1997, Dr. Manchin completed a form for workers' compensation stating that Plaintiff was diagnosed with dizziness and hypertension, and that he was totally disabled beginning February 3, 1995 (R. 162).

On June 18, 1997, Plaintiff reported he was still having problems with dizziness (R. 166). He told Dr. Manchin "he certainly can't go back to work and expose people to dangerous situation [sic] in that atmosphere," and that he was not able to drive most of the time.

A July 23, 1997 chest x-ray was normal (R. 177).

On July 25, 1997, Plaintiff was examined by cardiologist John Wurtzbacher, M.D. for his "lightheaded spells, flushing and hypertension" (R. 171). His examination was completely unremarkable except for his blood pressure of 145/102. Dr. Wurtzbacher diagnosed dizziness and near syncope, etiology uncertain, consider neurocardiac origin; flushing, consider remote chance of carcinoid syndrome; and hypertension (R. 170). Dr. Wurtzbacher subsequently wrote to Dr. Manchin, stating he suspected Plaintiff's spells might be either neuropsychiatric, neurocardiac

(vasovagal) or carcinoid syndrome.

On July 28, 1997, Marc Haut, Ph.D., performed a neuropsychological evaluation of Plaintiff as part of his application for Social Security (R. 427-430). Plaintiff told Dr. Haut he no longer felt "as if the room spins," but rather got heated up, shaky, and feeling flushed. He would then have to lie down, as he would lose energy at that point. These events occurred four to five times per week.

Upon mental status examination, Plaintiff was generally pleasant and cooperative. His affect was generally broad and appropriate. He reported no difficulty with interpersonal or social functioning. He denied depression. Rapid alternating finger movements were above average bilaterally while distal coordination was mildly impaired. He had no significant difficulties with performance of a variety of other motor tasks. He was impulsive, but there was no indication of hemispatial inattention and spatial judgment was well above average. Block construction was low average and complex geometric design construction was average.

Plaintiff's spontaneous speech was fluent, his comprehension was intact, and his verbal skills were average and consistent with hiss post-high school education. He had no problems with repetition and only some mild retrieval problems with confrontation naming. His general cognitive efficiency was mildly reduced. He had mild problems with visual tracking and motor response speed with mild to low average problems when cognitive flexibility was required.

Dr. Haut noted Plaintiff's personality testing results were consistent with an individual who was likely to focus on physical symptomatology and physical functioning, particularly at times of stress (R. 429). He concluded that Plaintiff experienced at least a mild level of cognitive dysfunction, but did not meet the criteria for an organic mental disorder. He did, however, believe that Plaintiff met "criteria for listing 12.07, a somatoform disorder, [as] indicated by his multiple physical symptoms that have impacted on his life and functioning." Regarding the "B" criteria of

the mental listings, however, Dr. Haut found that Plaintiff had only a slight restriction of activities of daily living, no limitation on social functioning, and would often have impaired concentration. Dr. Haut would not comment on deterioration or decompensation in work-like settings, noting commenting on that would be difficult.

Dr. Haut concluded that it was possible that Plaintiff's fatigue and difficulty with problem solving could impact on his ability to work flexibly on the job. He did not believe Plaintiff could currently work in his job in the mines. He expressly noted, however, that, "as you know translation from impairment with a specific job and meeting criteria for social security disability are not one-to-one."

On July 31, 1997, Regina Josell, Psy.D., performed a psychological evaluation of Plaintiff (R. 131-148). Plaintiff reported he slept well, his appetite was good, and his mood varied from euthymic to irritable. His current stressors included finances and worry about one of his sons. Dr. Josell performed a psychophysiological evaluation which revealed moderate muscle tension (forehead placement) as well as mildly low finger temperature. When Plaintiff engaged in a relaxation exercise, his muscle tension decreased to near normal limits and temperature increased to near normal limits. Dr. Josell opined the evaluation results suggested Plaintiff was likely to respond physiologically to stress. She found no evidence of depression. She also opined he did not appear to be suffering from an anxiety disorder, although she did note he may have been experiencing some worry due to his stressors (finances and his son). She felt his tendency to respond physiologically to stress could be contributing to his dizziness episodes. She felt he would benefit from biofeedback training because he had demonstrated the ability to change his physiological responses with relaxation exercises. She encouraged Plaintiff to find a therapist near his home who could provide biofeedback and relaxation exercises.

On August 1, 1997, otolaryngologist Sam Kinney, M.D., examined Plaintiff's inner ear

function (R. 169). The examination was essentially normal. Vestibular testing was normal.

The first administrative hearing was held on January 16, 1998 (R. 181). Plaintiff's wife attended with him. Plaintiff testified he hardly drove at all because he was afraid due to the dizzy spells (R. 185). Most of the time his wife drove. He testified that doctors at the Cleveland Clinic suggested psychological counseling, and he went, but as far as he was concerned, it was a waste. He did not feel he needed that type of treatment.

Plaintiff testified he never had any problems in his jobs getting along with his coworkers or his bosses. He testified he "g[o]t along good" with people (R. 197). He and his wife used to go dancing and he used to bowl before he started having the dizzy spells. He'd only gone out dancing with her once since being off work (R. 200). He used to have friends he and his wife would go camping with. He testified that he and his wife did not argue or hassle (R. 206)

A chest x-ray in June 1999 showed very mild degenerative disc disease of the thoracic spine (R. 583).

Plaintiff began treating at the Veterans' Administration Hospital ("VA") in August 1999 (R. 539). The initial impression was chronic dizziness, psoriatic rash of knee, umbilical hernia, hypertension, agent orange exposure, and elevated fasting blood glucose. On August 25, 1999, Plaintiff told the VA Physician's Assistant that he had been "walking the trail in Worthington" and felt weak, shaky, and like he was going to pass out (R. 542). He was instructed on how to treat low blood sugar, and was told to let someone know where he was going when he went out.

On October 22, 1999, Plaintiff began diabetes care classes at the VA (R. 543).

On October 25, 1999, Plaintiff presented to the podiatry department of the VA complaining of a "thick toenail" on his right big toe (R. 545). He said the toe did not bother him except for

cosmesis.[6]  He also complained of tingling and burning in his feet.  The diagnosis was diabetic neuropathy.

On November 3, 1999, Plaintiff presented for the  first of three diabetes interdisciplinary group classes for diabetes education (R. 547).

On November 5, 1999, Plaintiff attended the stress-management/life style class for diabetes education at the VA (R. 550).

On November 8, 1999, Plaintiff was examined in the VA ENT clinic for his complaints of chronic dizziness (R. 551).  He reported getting dizzy two to four times per day, but what he described was "unsteadiness, not a true vertigo."  He said he almost passed out and had to lie down.  Afterward he was "wiped out."  The assessment was "Dizziness, unspecified."  He had normal ENG's.  The doctor did not think he had an inner ear problem.

On January 1, 2000, Plaintiff reported he had not been achieving his goals regarding diabetes care because his father had recently died and his wife had undergone two major surgeries and he was taking care of her (R. 552).  He said his family had been under stress.  The VA clinic nurse advised Plaintiff they were there for him if he needed anything.

On February 7, 2000, Plaintiff received a home blood glucose monitoring system (R. 554).  He was on no medications for diabetes, and was to control it with diet.  He said he liked to walk a lot and also rode an exercise bike, but was "off this" as well as his diet for the past couple of months due to his father's death and having the flu.

On May 31, 2000, Plaintiff presented for intermittent difficulty swallowing of many years duration (R. 568).  Upon examination, Plaintiff was very healthy-looking, in no acute distress, and

---

[6]1.The preservation, restoration, or bestowing of bodily beauty.  2.  The surgical correction of a disfiguring physical defect.  DORLAND'S ILLUSTRATED MEDICAL ENCYCLOPEDIA, 427 (30th ed. 2003).

relatively free of major medical problems. He had some limitation of the cervical spine secondary to degenerative joint disease as well as limitation of the upper thoracic spine. Plaintiff was diagnosed with chronic intermittent dysphagia which was off and on to certain foods; and chronic cough possibly secondary to gastroesophageal reflux disorder ("GERD") as an atypical manifestation.

On July 3, 2000, Plaintiff presented to the VA for a foot care follow up (R. 571). He stated he still had neuropathic pain in his right foot. He took Elavil only when he had burning, tingling and pain in his feet, and did not take it all the time. The diagnosis remained diabetic neuropathy.

Lumbar spine x-rays in November 2000 showed degenerative changes in the upper lumbar spine with anterior osteophytes and minimal disc space narrowing (R. 354).

A CT scan of the cervical spine in May 2001 showed degenerative changes and encroachments bilaterally (R. 351).

In March 2002, Plaintiff presented to a psychologist at the VA hospital for an Initial Evaluation for a new service-connected claim of Post-Traumatic Stress Disorder ("PTSD")(R. 373-375). It was noted he was receiving a 30% service-connected disability benefit based on his diabetes and peripheral neuropathy secondary to diabetes. He was still not taking any medication for diabetes, but was to control it with diet.

Plaintiff's chief complaint was "I am here for evaluation of PTSD" (R. 373). His "current symptoms" were reported by the doctor as follows:

> He complains of intrusive recollection of his Vietnam experience which made him feel upset and started gritting his teeth. He said often times while driving on the interstate and going by a truck and trailer he started to feel jumpy, nervous, gritting his teeth and recalling himself riding shotgun in a truck trailer as protector of the driver. He recalled at that time, the NVA was bombing the base with rocket and mortars. Then the driver had to stop the truck and both of them took shelter underneath the back of the trailer. He heard the shrapnel hitting the truck from different directions but luckily they were safe at that time. He said sometimes with the hot weather or rain he becomes nervous and keeps thinking of Vietnam. His

mood becomes bitchy, moody, angry with raising voice, screaming and yelling. He also throws or bangs things. He reported his mood as depressed, helpless, hopeless, worthless, useless. However, he denied suicidal or homicidal ideations. He stated that his mood changes quickly with quick temper, anger, rage with potential to explode or having road rage towards other drivers. He said that his bad temper affects his current relationship with his wife who stated she wanted to divorce him. He got into an argument with co-worker and his manager often. However, he denied having physical fight with his co-worker. He prefers working alone in the coal mine as a supply worker. He complains of poor sleep with frequent awakening to noises in the night and reported scary dreams on and off waking him up, feeling shaky, nervous, jittery, scared and sweaty and unable to return to sleep. He sleeps about 4-5 hours nightly. He has fair appetite and low energy. He is receiving Social Security Disability income for dizzy spells and chronic low back pain. He had surgery on his right knee, right toe which was crushed by a sheer [sic] at the coal mine. He avoids going to parties, camping, except sometimes he goes to restaurants with his wife but he goes rarely to the mall due to feeling uneasy among crowds. He kept looking around him, checking doors many times at night and looks through the windows with very light sleep. He feels people are watching, following him, and he watches his back all the time. He claims he remains hypervigilant and on guard most times. Loud noise or loud banging makes him feel jumpy.

Plaintiff also recounted to the doctor the first day he arrived in Vietnam and heard soldiers were killed by rockets while waiting to go home. He said this made him feel scared, shaky and worried about his own life each and every day he was there. The above-recounted incident was the thing that bothered him the most, however. He reported that luckily no one was hurt.

Plaintiff told the doctor that after Vietnam his personality changed from being easy going to being a "jerk." He became more isolated and had no close friends. He got divorced from his first wife due to his unstable mood and behavior with frequent anger spells and bad temper. He became rebellious to authority with potential for arguments and unwilling to follow orders. He had difficulty getting along with other people. He said he lost two marriages due to this unstable behavior.

Upon mental status examination, Plaintiff was alert and fully oriented (R. 375). He maintained good eye contact and interacted pleasantly. His behavior was appropriate. His short term memory was poor to fair. He could recall only three out of four after 15 minutes. He was, however, able to perform serial 7's. He told the doctor that "Vietnam messed him up in every way."

He became mad, short fused and difficult to get along with.  He said he had potential to lose his job due to unstable behavior.  He said he lost his relationship with his wife and children and had difficulty expressing emotional feelings of love and care towards them.  He claimed he lost the chance for a good promotion in his job due to frequent job interruptions.  He claimed he lost the meaning of his life after his return from the service, along with the chance to be more productive.

The examiner's assessment was as follows:

This patient reported experiences in Vietnam where he was exposed to sniper shots, rockets, mortar rounds and he reacted to these stressors with fear, horror of being killed.  Although he was not involved directly in combat in Vietnam but he was caught up in many dangerous situations under enemy fire.  After return from Vietnam he continued to have scary dreams, nightmares, flash back memory, intrusive recollection of the above experiences.  He became hyper-startled to loud noise, he remains hypervigilant and hyperaroused with poor sleep, frequent awakening.  He became paranoid and reported feeling being with mood swings, anger, road rage, potential for arguments and loss of control.  He feels chronically depressed, helpless, hopeless, worthless, and useless, but he denied suicidal or homicidal ideations.  He became socially withdrawn and avoided crowds or social gatherings.  He has difficulty getting along with co-workers, supervisors or even his wife with frequent conflicts.  He has been divorced two times.  He feels he has foreshortened future and has lost his chance of being productive.  I believe that the above symptoms meet the criteria for PTSD chronic.

The VA examiner diagnosed PTSD, chronic, and found Plaintiff's stressors were severe, chronic anxiety and depression, unemployment, and poor social and familial relationships.  His GAF was assessed as 45-50[7] due to chronic anxiety, nightmares, intrusive recollections, flash back memories, paranoid ideations of persecution, poor social and familial relationships, and unstable affect, mood, and behavior (R. 375).

---

[7]A GAF of 41-50 indicates **Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job).  Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

At the second hearing, on August 14, 2002, Plaintiff's wife was again present (R. 603). Plaintiff testified he drove only five to ten miles a week. He testified that, between 1995 and 2000, he could not walk very far, stating:

> I mean, if I would go to the mall, I might walk down the end of the mall and back or something, but then by the time I'm doing it, I'm getting numb while I'm . . . walking.

(R. 619).

On December 9, 2002, subsequent to the second hearing, Plaintiff was examined by Bruce Guberman, M.D., for his workers' compensation claims for the series of injuries that had occurred on November 23, 1977, October 15, 1981, December 3, 1982, and August 12, 1983 (R. 236). Dr. Guberman reviewed all the records regarding these injuries. Plaintiff told the doctor he was still receiving treatment for his back pain. He took medication intermittently, but currently took only over-the-counter Tylenol on a daily basis. He also took Ibuprofen approximately twice per week. He said that, overall, the low back pain had gradually and progressively worsened. He had constant sharp to dull low back pain with radiation into both hips and the lateral aspect of both legs to the mid calves. He reported numbness and tingling in the legs, and weakness and instability in the right leg. Plaintiff stated he could no longer dance or bowl and had difficulty hunting because of the low back injury (R. 238). An MRI revealed mild dessication of multiple intervertebral discs. The L5-S1 disc was spared. Minimal disc bulges were noted at L3-4 and L4-5. At L3-4 there was degenerative arthropathy of the left facet joint. There was no evidence of central canal stenosis or foraminal narrowing at any level.

Plaintiff also reported intermittent sharp to dull pain in the cervical spine, occurring every day (R. 238). An MRI showed spondylitic changes most prominent at C5-6 and C6-7, with no significant spinal stenosis or frank herniation.

21

Plaintiff stated he still had pain and swelling in his right big toe (R. 239). He said his toenail was deformed and scarred. He also stated he still had pain in his right knee and in his left elbow from separate work accidents. Plaintiff also reported shortness of breath with exertion, and an occasional cough. He also reported frequent dizziness. He had a three-year history of diabetes treated with diet alone. He had numbness and burning in both feet.

Plaintiff's current medications were over-the-counter Tylenol and Ibuprofen, aspirin, Lisinopril for high blood pressure, and an unknown medication for cholesterol (R. 239).

Upon physical examination, Plaintiff ambulated with a normal gait (R. 240). His gait was stable and he required no ambulatory aids. He was uncomfortable sitting and supine. Pulses were normal, but he did have varicose veins bilaterally and 1+ pitting edema in the right foot and ankle and a trace in the left foot and ankle. There was no brawny edema, statis ulcers, stasis dermatitis, clubbing or cyanosis. There was moderate tenderness of the cervical spine with no paravertebral muscle spasm. There was some limitation of range of motion of the cervical spine. The shoulders were not tender and range of motion was normal. The left elbow had slightly decreased range of motion, but the right was normal. The wrists were normal as were the hands.

The right knee was tender with crepitation, but no redness, warmth or swelling. Extension was normal, but flexion was limited. The ankles and feet were tender with swelling . The right first toenail was deformed, thickened and discolored. Flexion of the interphalangeal joint of the right big toe was limited. All other toes were normal.

Plaintiff had mild decreased lumbar lordosis (R. 241). Flexion was limited. Plaintiff could stand on one leg at a time with difficulty. Percussion of the lumbar spine resulted in mild to moderate tenderness, but no muscle spasm. Straight leg raising was negative at 80 degrees on the right and 85 on the left in the supine position, and 90 bilaterally in the sitting position. Range of

motion of the lumbar spine was diminished.  Hip flexion and extension was normal.  There was no

evidence of muscle weakness.  There was loss of sensation in the toes of both feet and the fingers

of both hands.  Plaintiff could walk on his heels, toes, heel-to-toe and squat with difficulty.  He

required assistance rising from the squatting position.

Dr. Guberman's impression was:

1.  Acute and chronic lumbosacral strain, post-traumatic following work-related injury occurring on November 23, 1977, with mild desiccation of multiple discs with disc bulging at multiple levels by MRI scan;

2.  Acute and chronic cervical spine strain, post-traumatic following work-related injury occurring on October 15, 1981, with multiple spondylitic changes at multiple levels by MRI scan;

3.  Status post contusion of the right leg occurring at work December 3, 1982, resolved without sequella; and

4.  Status post compound fracture of the right great toe occurring at work August 12, 1983, with persistent range of motion abnormalities and persistent scarring of the right great toenail.

Dr. Guberman found Plaintiff's back and neck pain had progressed despite conservative

treatment (R. 242).  He also found Plaintiff's sensory and reflex abnormalities in the lower

extremities were probably related to his diabetic peripheral neuropathy.


### III.  ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's

regulations at 20 C.F.R. § 404.1520, the second ALJ made the following findings:

1.     The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through June 30, 2001.

2.     The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3.  The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations. 20 CFR § 404.1520(b).

4.  These medically determinable impairments do not meet or medically equal one of the listed impairments in  Appendix 1, Subpart P, Regulation No. 4.

5.  The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.  The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR §404.1527).

7.  For the period February 2, 1995 through September 7, 2000, the claimant retained the residual functional capacity to perform a limited range of light work.  He had to avoid workplace hazards such as dangerous and moving machinery and unprotected heights.  He was not able to do any climbing.  He was limited to performing unskilled, low stress work with one or two step instructions; the work should be routine and repetitive and involve working with things rather than people; and the work should be entry level.

8.  The claimant has been unable to perform any of his past relevant work (20 CFR § 404.1565).

9.  The claimant was a "younger individual" for the period February 2, 1995 through March 6, 1996.  For the period March 7, 1996 through September 7, 2000, the claimant was an individual "closely approaching advanced age." For the period beginning September 8, 2000, the claimant is an individual of "advanced age."  (20 CFR § 404.1563).

10.  The claimant has  "more than a high school education" (20 CFR § 404.1564).

11.  The claimant has no transferable skills from any past relevant work (20 CFR 1 404.1568).

12.  The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

13.  For the period February 5, 1995 through September 7, 2000, although the claimant's exertional limitations did not allow him to perform the full range of light work, using Medial-Vocational Rules 202.21 and 202.14 as a framework for decision-making, there are a significant number of jobs in the national economy that he could have performed.  Examples of such jobs include work as a packer with 141 jobs locally and 215,300 jobs nationally; an assembler with 294 jobs locally and 495,100 jobs nationally; and a janitor

with 259 jobs locally and 179,800 jobs nationally. The vocational expert testified that these jobs are consistent with standards found in the Dictionary of Occupational Titles.

14.    For the period beginning September 8, 2000, a finding of "disabled" is made within the framework of Medical-Vocational Rule 202.06.

15.    The claimant was not under a "disability," as defined in the Social Security Act, at any time during the period February 2, 1995 through September 7, 2000 (20 CFR § 404.1520(f)).

16.    The claimant has been under a "disability" for the period beginning September 8, 2000.[8]

(R. 272-273).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be

---

[8]The ALJ expressly found that Plaintiff could be considered an individual of advanced age beginning September 8, 2000, six months prior to his attainment of age 55. With an RFC to perform a limited range of light work, a finding of "disabled" is reached for an individual of advanced age. The ALJ therefore adopted the State agency's finding that Plaintiff was under a disability beginning exactly six months before his 55th birthday.

somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"  *Hays*, 907 F.2d at 1456 (*quoting Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)).  In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law."  *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B.  Contentions of the Parties

Plaintiff contends the Appeals Council's decision dated March 24, 2004, should be reversed and the claimant granted Social Security benefits from February 1995 onward.  The undersigned notes that counsel did not use headings to delineate his sub-arguments.  The undersigned believes those arguments to be as follows:

1. "Dr. Guberman's report  establishes the musculoskeletal problems that the Claimant was complaining of during the social security hearings that he has had;"

2.  "Dr. Marc Haut concluded that the Claimant met the listing for the 12.08 somatoform disorder.  His findings also corroborated that the Claimant met enough of the "B" criteria, as well.  Dr. Haut concluded that the Claimant was unable to engage in substantial, gainful employment, based on his condition that he found him in, in his report of July 30, 1997.  This was totally overlooked by the Administrative Law Judge;"

3.  "The Administrative Law Judge, in his decision, also noted that the Claimant received treatment for posttraumatic stress disorder but was not evaluated for posttraumatic stress disorder until March 26, 2002.  He further stated that he did not find posttraumatic stress disorder to be a severe impairment for the time period applicable to this decision . . . . The Claimant contends that the Administrative Law Judge was incorrect;" and

4.  "The undersigned believes the Court failed to follow the *Craig* standards concerning the Claimants impairments for dizziness, posttraumatic stress syndrome, and neck and back pain."

Defendant contends substantial evidence supports the Commissioner's finding that prior to September 8, 2000, Plaintiff could perform a limited range of light work.  Defendant addresses Defendant's arguments as follows:

1. "Dr. Guberman's report merely shows that Plaintiff was assessed a small percentage impairment for workers' compensation purposes . . . . Moreover, the ALJ considered the medical evidence of Plaintiff's orthopedic injuries, which essentially show minor disc protrusions and degenerative changes . . . . ;"

2. "[T]he ALJ found that Dr. Haut's opinion regarding §12.07 was inconsistent with his findings that Plaintiff had only slight restrictions in activities of daily living, no limitations in social functioning, and often experienced impairments in concentration . . . . Plaintiff is mistaken in his assertion that Dr. Haut concluded that he was unable to engage in substantial gainful employment . . . . ;"

3. "[T]he ALJ properly found that Plaintiff's PTSD was not a severe impairment;" and

4. "The Commissioner fully complied with this Court's order to evaluate Plaintiff's subjective complaints in accordance with *Craig*, and, specifically, to state whether Plaintiff had a medical impairment capable of causing the type of pain and other symptoms alleged."

### C. Dr. Guberman's Report

Plaintiff first argues: "Dr. Guberman's report establishes the musculoskeletal problems that the Claimant was complaining of during the social security hearings that he has had." Defendant contends that "Dr. Guberman's report merely shows that Plaintiff was assessed a small percentage impairment for workers' compensation purposes . . . . Moreover, the ALJ considered the medical evidence of Plaintiff's orthopedic injuries, which essentially show minor disc protrusions and degenerative changes . . . ."

On December 9, 2002, subsequent to the second hearing, Plaintiff was examined by Bruce Guberman, M.D., for his workers' compensation claims for the series of injuries that occurred on November 23, 1977, October 15, 1981, December 3, 1982, and August 12, 1983 (R. 236). Plaintiff told Dr. Guberman he took medication only intermittently for his pain, and currently took only over-the-counter Tylenol on a daily basis. He also took Ibuprofen approximately twice per week. He said that, overall, the low back pain had gradually and progressively worsened. Plaintiff stated he could no longer dance or bowl and had difficulty hunting because of the low back injury (R. 238). An MRI revealed minimal disc bulges at L3-4 and L4-5 with degenerative arthropathy of the left facet

joint at L3-4.  There was no evidence of central canal stenosis or foraminal narrowing at any level.

Plaintiff also reported intermittent sharp to dull pain in the cervical spine, occurring every day (R. 238).  An MRI showed spondylitic changes most prominent at C5-6 and C6-7, with no significant spinal stenosis or frank herniation.

Plaintiff stated he still had pain and swelling in his right big toe (R. 239).  He also stated he still had pain in his right knee and in his left elbow from separate work accidents.  He also reported shortness of breath with exertion and an occasional cough.  He also reported frequent dizziness.  He had a three-year history of diabetes treated with diet alone, and numbness and burning in both feet.

Plaintiff's only current medications were over-the-counter Tylenol and Ibuprofen, aspirin, Lisinopril, and something for cholesterol (R. 239).

Upon physical examination, Plaintiff ambulated with a normal, stable gait, requiring no ambulatory aids.  He was uncomfortable sitting and supine.  Pulses were normal, but he did have varicose veins bilaterally and 1+ pitting edema in the right foot and ankle and a trace in the left foot and ankle.  There was no brawny edema, statis ulcers, stasis dermatitis, clubbing or cyanosis.  There was moderate tenderness of the cervical spine with no paravertebral muscle spasm.  There was some limitation of range of motion of the cervical spine.  The shoulders were not tender and range of motion was normal.  The left elbow had slightly decreased range of motion, but the right was normal.  The wrists were normal as were the hands.

The right knee was tender with crepitation, but no redness, warmth or swelling.  Extension was normal, but flexion was limited.  The ankles and feet were tender with swelling .  The right first toenail was deformed, thickened and discolored.  Flexion of the interphalangeal joint of the right big toe was limited.  All other toes were normal.

Plaintiff had mild decreased lumbar lordosis (R. 241).  Flexion was limited.  He could stand

on one leg at a time with difficulty. Percussion of the lumbar spine resulted in mild to moderate tenderness, but no muscle spasm. Straight leg raising was negative at 80 degrees on the right and 85 on the left in the supine position, and 90 bilaterally in the sitting position. Range of motion of the lumbar spine was diminished. Hip flexion and extension was normal. There was no evidence of muscle weakness. There was loss of sensation in the toes of both feet and the fingers of both hands. Plaintiff could walk on his heels, toes, heel-to-toe, and squat with difficulty. He required assistance rising from the squatting position.

Dr. Guberman's impression was:

1. Acute and chronic lumbosacral strain, post-traumatic following work-related injury occurring on November 23, 1977, with mild desiccation of multiple discs with disc bulging at multiple levels by MRI scan;

2. Acute and chronic cervical spine strain, post-traumatic following work-related injury occurring on October 15, 1981, with multiple spondylitic changes at multiple levels by MRI scan;

3. Status post contusion of the right leg occurring at work December 3, 1982, resolved without sequella; and

4. Status post compound fracture of the right great toe occurring at work August 12, 1983, with persistent range of motion abnormalities and persistent scarring of the right great toenail.

Remembering that the relevant time period in this matter is from 1995 until 2000, the undersigned finds it significant that Dr. Guberman, more than two years after the relevant time period, found such mild impairments, while also finding Plaintiff's back and neck pain had progressed at that time. Additionally, in February 7, 2000, near the end of the relevant time frame, Plaintiff reported to his doctors at the VA that he liked to walk a lot and also rode an exercise bike. Yet by 2002, two years after the relevant time period, Plaintiff reported he could not even walk to the end of the mall and back without going numb. This evidence tends to show Plaintiff's musculoskeletal impairments were progressive, and had become much worse by 2002, two years

after the relevant time period.  Evidence during the relevant time period showed only very mild degenerative disc disease of the thoracic spine.  An MRI revealed only mild dessication of multiple intervertebral discs with minimal disc bulges at L3-4 and L4-5 and degenerative arthropathy of the left facet joint at L3-4.  There was no evidence of central canal stenosis, foraminal narrowing or herniation at any level, even in 2002.

Dr. Guberman also found Plaintiff's sensory and reflex abnormalities in the lower extremities were probably related to his diabetic peripheral neuropathy, which again was not even diagnosed until October 1999.

While the undersigned agrees that Dr. Guberman's report supports Plaintiff's claim that he had  musculoskeletal problems, it  also supports the ALJ's determination that Plaintiff was able to work at the light exertional level through September 7, 2000.

### D.  Dr. Haut's Report

Plaintiff next argues:

Dr. Marc Haut concluded that the Claimant met the listing for the 12.07 somatoform disorder.  His findings also corroborated that the Claimant met enough of the "B" criteria, as well.  Dr. Haut concluded that the Claimant was unable to engage in substantial, gainful employment, based on his condition that he found him in, in his report of July 30, 1997.  This was totally overlooked by the Administrative Law Judge.

This assertion misstates the facts in several aspects.  First, Dr. Haut's findings did not "corroborate[] that the Claimant met enough of the "B" criteria" of 12.07.  Second, Dr. Haut did not conclude that Plaintiff was unable to engage in any employment, only "his job in the mines" (R. 430).  Finally, the ALJ fully considered and discussed Dr. Haut's report.

Defendant contends "the ALJ found that Dr. Haut's opinion regarding §12.07 was inconsistent with his findings that Plaintiff had only slight restrictions in activities of daily living, no limitations in social functioning, and often experienced impairments in concentration . . . .

Plaintiff is mistaken in his assertion that Dr. Haut concluded that he was unable to engage in substantial gainful employment . . . ."

The ALJ noted that Dr. Haut opined that Plaintiff "meets criteria for listing 12.07, a somatoform disorder." Listing 12.07 provides as follows:

12.07 *Somatoform Disorders:* Physical symptoms for which there are no demonstrable organic findings or known physiological mechanisms.

1. The required level of severity for these disorders is met when the requirements **in both A and B** are satisfied.

A. Medically documented by evidence of one of the following:

1. A history of multiple physical symptoms of several years duration, beginning before age 30, that have caused the individual to take medicine frequently, see a physician often and alter life patterns significantly; or

2. Persistent nonorganic disturbance of one of the following:

a. Vision; or

b. Speech; or

c. Hearing; or

d. Use of a limb; or

e. Movement and its control (e.g., coordination disturbance, psychogenic seizures, akinesia, dyskinesia; or

f. Sensation (e.g., diminished or heightened).

3. Unrealistic interpretation of physical signs or sensations associated with the preoccupation or belief that one has a serious disease or injury;

**AND**

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

First, although Dr. Haut opined Plaintiff had "multiple physical symptoms that have

impacted on his life and functioning," he did not indicate these symptoms began before age 30, as is required by the Listing.  Although he also found Plaintiff had "difficulty with sensation," this was based on  his "headaches as well as loss of energy and functioning," which is not totally consistent with the requirement of the Listing.  Even if, arguably, Plaintiff did meet all the "A" criteria for a somatoform disorder, Dr. Haut's own findings show Plaintiff did not meet the "B" criteria.  Dr. Haut found Plaintiff did not have more than a slight restriction of basic activities of daily living; had no limitation in maintaining social functioning; and often had difficulties in maintaining concentration.  He could not determine whether Plaintiff had a potential for deterioration in a work like setting.  These limitations on their face do not meet the requirements of the Listing.  He did not find Plaintiff met even one of the "B" criteria, much less two.  Additionally, Dr. Haut only opined that he did not believe Plaintiff could work "in his job in the mines."  He then expressly stated: "However, as you know translation from impairment with a specific job and meeting criteria for social security disability are not one-to-one."

The  ALJ therefore properly found that Dr. Haut's own findings were not consistent with a finding that Plaintiff met Listing 12.07.

The undersigned finds substantial evidence supports the ALJ's determination that Plaintiff did not meet Listing 12.07.

### E.  PTSD

Plaintiff next argues: "The Administrative Law Judge, in his decision, also noted that the Claimant received treatment for posttraumatic stress disorder but was not evaluated for posttraumatic stress disorder until March 26, 2002.  He further stated that he did not find posttraumatic stress disorder to be a severe impairment for the time period applicable to this decision . . . . The Claimant contends that the Administrative Law Judge was incorrect."  Defendant contends

"the ALJ properly found that Plaintiff's PTSD was not a severe impairment."

Plaintiff correctly points out that he was not diagnosed with PTSD until after the relevant time period. In fact, he did not seek treatment for PTSD until March 26, 2002 a year and a half after the relevant time period ended. Still, Plaintiff argues the symptoms of PTSD existed prior to September 8, 2000, but were just not diagnosed. A review of the record, however, shows that while Plaintiff may have had some symptoms of PTSD during the relevant time period, the severity clearly changed from that time until he was diagnosed in 2002.

The PTSD symptoms Plaintiff reported to the VA psychologist in 2002 were as follows:

> His mood becomes bitchy, moody, angry with raising voice, screaming and yelling. He also throws or bangs things. He reported his mood as depressed, helpless, hopeless, worthless, useless. However, he denied suicidal or homicidal ideations. He stated that his mood changes quickly with quick temper, anger, rage with potential to explode or having road rage towards other drivers. He said that his bad temper affects his current relationship with his wife who stated she wanted to divorce him. He got into an argument with co-worker and his manager often. However, he denied having physical fight with his co-worker. He prefers working alone in the coal mine as a supply owrker. He complains of poor sleep with frequent awakening to noises in the night and reported scary dreams on and off waking him up, feeling shaky, nervous, jittery, scared and sweaty and unable to reutn to sleep. He sleeps about 4-5 hours nightly. He has fair appetite and low energy. He is receiving Social Security disability income for dizzy spells and chronic low back pain. He had surgery on his right knee, right toe which was crushed by a sheer [sic] at the coal mine. He avoids going to parties, camping, except sometimes he goes to restaurants with his wife but he goes rarely to the mall due to feeling uneasy among crowds. He kept looking around him, checking doors many times at night and looks through the windows with very light sleep. He feels people are watching, following him, and he watches his back all the time. He claims he remains hypervigilant and on guard most times. Loud noise or loud banging makes him feel jumpy.

Based on these subjective symptoms, the VA doctor found:

> This patient reported experiences in Vietnam where he was exposed to sniper shots, rockets, mortar rounds and he reacted to these stressors with fear, horror of being killed. Although he was not involved directly in combat in Vietnam but he was caught up in many dangerous situations under enemy fire. After return from Vietnam he continued to have scary dreams, nightmares, flash back memory, intrusive recollection of the above experiences. He became hyper-startled to loud noise, he remains hypervigilant and hyperaroused with poor sleep, frequent

awakening.  He became paranoid and reported feeling being with mood swings, anger, road rage, potential for arguments and loss of control.  He feels chronically depressed, helpless, hopeless, worthless, and useless, but he denied suicidal or homicidal ideations.  He became socially withdrawn and avoided crowd or social gatherings.  He has difficulty getting along with co-workers, supervisors or even his wife with frequent conflicts.  He has been divorced two times.  He feels he has foreshortened further and has lost his chance of being productive.  I believe that the above symptoms meet the criteria for PTSD chronic.

The undersigned notes, however, that  Plaintiff had not reported any such severe symptoms to any doctor prior to March 26, 2002, and certainly not before September 8, 2000.  In fact, to the undersigned, the VA report does not even appear to describe the same person as the earlier evidence.  Remembering that Plaintiff told the VA examiner that he had had these severe symptoms since Vietnam, it is significant that Plaintiff  told Dr. Kurapaiti in 1996 that he got along well with all his children and raised them.  One of his adopted sons had cerebral palsy and he kept in close touch with him.  He described himself as "an easy-going person."  His sleep was good, he did not exhibit any signs of depression, his mood and affect were euthymic, and, although he described himself as anxious and tense "at times," he did not present with any symptoms of this during interviews. In addition, Dr. Kurapati opined Plaintiff's GAF at that time was 61 to 70, and had been 71 to 80 a year earlier, indicating only transient to mild symptoms or slight limitations.

In 1997, Plaintiff told Dr. Haut he had no difficulty with interpersonal or social functioning. He denied depression, his affect was broad and his mood was appropriate. That same year, he told psychologist Josell that he slept well, his appetite was good, and his mood varied from euthymic to irritable.  His current stressors included finances and worry about one of his sons. Dr. Josell  found no evidence of depression.  She also opined he also did not appear to be suffering from an anxiety disorder, although she did note he may have been experiencing some worry due to his stressors (finances and his son).

At the first Administrative Hearing in 1998, Plaintiff testified that doctors at the Cleveland

Clinic suggested psychological counseling, and he went, but as far as he was concerned, it was a waste. He did not feel he needed that type of treatment. Most significantly, Plaintiff testified he never had any problems in his jobs getting along with his coworkers or his bosses, and that he "got along good" with people (R. 197). This is in stark contrast to his report to the VA that got into arguments with co-worker and his manager often. Further, while Plaintiff told the VA examiner that his bad temper affected his current relationship with his wife, that he had frequent conflicts with her, and that she wanted a divorce, he testified at the hearing that he and his wife did not argue or hassle (R. 206).

Plaintiff argues that medical evaluations made subsequent to the expiration of his insured status are not automatically barred from consideration, citing *Cox v. Heckler*, 770 F.2d 411 (4th Cir. 1985), *Branham v. Heckler*, 775 F.2d 1271 (4th Cir. 1985), and *Moore v. Finch*, 418 F.2d 1224 (4th Cir. 1969). In *Wilkins v. Secretary*, 953 F.2d 93 (4th Cir. 1991), the Fourth Circuit held that an ALJ may not reject a treating physician's retrospective opinion concerning the extent of past impairment in the absence of persuasive contrary evidence. Here, however, as already discussed, there was persuasive contrary contemporary evidence that Plaintiff did not have a severe impairment of PTSD during the relevant time period.

Based on all the above evidence, the undersigned finds substantial evidence supports the ALJ's determination that PTSD was not a severe impairment during the time period applicable to his decision.

## F. Credibility

Plaintiff next argues: "The undersigned believes the Court failed to follow the *Craig* standards concerning the Claimant's impairments for dizziness, posttraumatic stress syndrome, and neck and back pain." Defendant contends: "The Commissioner fully complied with this Court's

order to evaluate Plaintiff's subjective complaints in accordance with *Craig*, and, specifically, to state whether Plaintiff had a medical impairment capable of causing the type of pain and other symptoms alleged." The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir.1984) (*citing Tyler v. Weinberger*, 409 F.Supp. 776 (E.D.Va.1976)).

The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in *Craig v. Chater*, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .
>
> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated*, *See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

*Craig, supra* at 594.

The undersigned finds the ALJ fully complied with the first, threshold step in *Craig*, finding the objective evidence showed Plaintiff had medically determinable impairments that could

reasonably be expected to cause some of the symptoms described.  The ALJ also found Plaintiff did

experience pain and weakness from time to time, but not to the frequency and severity alleged.  The

ALJ was therefore required to go on to the second step in *Craig*.

A review of the ALJ's decision shows the ALJ considered all the second-step factors.  He

discussed Plaintiff's statements about his pain and limitations, his medical history, the medical signs

and laboratory findings, objective evidence of pain, Plaintiff's daily activities, and the medical

treatment he took to alleviate his symptoms.  Notably, regarding treatment, Plaintiff told Dr.

Guberman he took medications only intermittently, and took only over-the-counter Tylenol daily.

Further, Plaintiff  was diagnosed with diabetes in August 1999, and was fully instructed on how to

control it with diet and exercise.  By January 1, 2000, however, Plaintiff reported he had not been

achieving his goals regarding diabetes care because his father had recently died and his wife had

undergone two major surgeries and he was taking care of her (R. 552).  A month later, he stated he

was still off his diet due to his father's death and having had the flu.  A claimant's failure to use

medications or treatment support the Commissioner's finding that the underlying condition was not

severe.  20 C.F.R. § 416.929(c)(3)(iv); *Mickles v. Shalala*, 29 F.3d 918, 929 n.8 (4th Cir. 1994)

(concurring opinion).  An "inconsistency between the claimant's characterization of the severity of

her condition and the treatment she sought to alleviate that condition is highly probative of the

claimant's credibility." *Id.*

Clearly, "[i]f a symptom can be reasonably controlled by medication or treatment, it is not

disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).  The failure to comply with

treatment recommendations supports the ALJ's inference that a claimant's symptoms are not as

severe as asserted.  *Hunter v. Sullivan*, 993 F.2d 31 (4th Cir.1992).

The ALJ also properly noted inconsistencies in Plaintiff's reports of his symptoms and

limitations. In this regard Social Security Ruling ("SSR") 96-7p provides as follows:

> One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record. The adjudicator must consider such factors as:

> The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.

> The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e). The adjudicator must also look at statements the individual made to SSA at each prior step of the administrative review process and in connection with any concurrent claim or, when available, prior claims for disability benefits under titles II and XVI. Likewise, the case record may contain statements the individual made in connection with claims for other types of disability benefits, such as workers' compensation, benefits under programs of the Department of Veterans Affairs, or private insurance benefits. However, the lack of consistency between an individual's statements and other statements that he or she has made at other times does not necessarily mean that the individual's statements are not credible. Symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms. Therefore, the adjudicator will need to review the case record to determine whether there are any explanations for any variations in the individual's statements about symptoms and their effects.

> The consistency of the individual's statements with other information in the case record, including reports and observations by other persons concerning the individual's daily activities, behavior, and efforts to work. This includes any observations recorded by SSA employees in interviews and observations recorded by the adjudicator in administrative proceedings.

In January 2000, Plaintiff told his VA physicians that he liked to walk "a lot" and also rode an exercise bike, yet at the hearing Plaintiff testified that between February 1995 and September 2000, he could not walk very far, only to the end of the mall and back.. Additionally, while Plaintiff told the VA doctors that his big toe did not bother him except for its appearance, he told the

workers' compensation examiner that he still had pain and swelling in the toe from a work injury. Plaintiff testified that Dr. Kurapati kept trying to tell him he had depression, while Dr. Kurapati's notes indicate Plaintiff did not exhibit any signs of depression and she did not diagnose or treat him for depression.

Further, the ALJ particularly considered Plaintiff's testimony at the second hearing regarding PTSD in his credibility analysis. He noted Plaintiff testified that he had been plagued with the symptoms of PTSD ever since his service in Vietnam in 1969-1970. In fact, Plaintiff testified PTSD and dizziness were the primary reasons for his being unable to work. Yet, as already discussed, there is no mention of the severe subjective symptoms of PTSD Plaintiff reported until his initial evaluation at the VA for PTSD in March 2002. Plaintiff's report of his symptoms at that time is totally inconsistent with any other evidence in the record. It seems especially significant to the undersigned that Plaintiff had actually mentioned Vietnam to Dr. Kurapati in 1996, in the following context:

> After finishing high school, he joined the armed services and went to Vietnam. After discharge he attended two years of college. He was married for the first time at age 19. That marriage lasted for 7 years and they had no children. He was married for a second time and that marriage lasted for 12 years. They adopted two children during that marriage. His third marriage was to his current wife and she has three children from a previous marriage. He states he gets along well with all the children and has raised them. One of his adopted sons suffers from Cerebral Palsy and the patient keeps in close touch with him . . . . He describes himself as an easy-going person.

(R. 437-438).

"Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir.1984). The undersigned finds substantial evidence supports the ALJ's credibility determination in this matter.

For all the above reasons, the undersigned also finds that substantial evidence supports the ALJ's conclusion that Plaintiff was not disabled between February 2, 1995 through September 7, 2000.

## V.  RECOMMENDATION

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's decision that Plaintiff was not under a disability between February 2, 1995 through September 7, 2000. I accordingly recommend Plaintiff's Motion for Motion for Judgment on the Pleadings  be **DENIED**, Defendant's Motion for Summary Judgment be **GRANTED**, and this case be dismissed from the court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.  A copy of such objections should also be submitted to the Honorable Irene M. Keeley, Chief United States District Judge.  Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.  28 U.S.C. § 636(b)(1); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn*, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this 26th  day of April, 2005.

s *John S. Kaull*
JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE